# Attachment 2
# Declaration of Sean Patrick Trende

# Part 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | 1:13CV658 |
| PATRICK LLOYD MCCRORY, in his official capacity as Governor of North Carolina, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | |
| *and* | ) ) | |
| LOUIS M. DUKE, *et al.*, | ) ) | 1:13CV660 |
| Plaintiffs-Intervenors, | ) ) | |
| v. | ) ) | |
| THE STATE OF NORTH CAROLINA, *et al.*, | ) ) | |
| Defendants. | ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:13CV861 |
| THE STATE OF NORTH CAROLINA, *et al.*, | ) ) | |
| Defendants. | ) | |

1

## DECLARATION OF SEAN P. TRENDE

Sean Patrick Trende, first being sworn, deposes and says as follows:

1.      I am over 18 years of age and am competent to testify regarding the matters discussed in this declaration.

2.      I am a recognized expert in the fields of psephology, voter behavior, voter turnout, polling, and United States demographic trends and political history, with particular emphasis on Southern politics.

3.      I have been retained in this matter to provide expert testimony. I am compensated at a rate of $300 per hour, excluding travel time. My fees are capped at a maximum of $30,000 for the preliminary injunction phase of this litigation.

4.      My *curriculum vitae* is attached to this declaration as **Exhibit 1**.

5.      A list of materials upon which I relied in support of this declaration is attached as **Exhibit 2**.

### EXPERT CREDENTIALS

6.      I have studied and followed United States elections on both a fulltime and part-time basis for over ten years.

7.      I received a B.A. degree from Yale University in 1995, with a double major in history and political science.

8.      I received a J.D. degree from Duke University in 2001.

9.      I also received an M.A. degree from Duke University in 2001, in political science.

10.     I joined RealClearPolitics in January of 2009 as their Senior Elections Analyst. I assumed a fulltime position with them in March of 2010. RealClearPolitics is one of the most heavily trafficked political websites in the world. It is routinely cited by the most influential voices in politics, including David Brooks of *The New York Times*, Brit Hume of *Fox News*,

2

Michael Barone of *The Almanac of American Politics*, Paul Gigot of *The Wall Street Journal*, and Peter Beinart of *The New Republic*.

11. My main responsibilities with RealClearPolitics consist of tracking, analyzing, and writing about elections. I also analyze and rate the competitiveness of these elections. As a part of carrying out these responsibilities, I have studied and written extensively about demographic trends in the country, exit poll data at the state and federal level, public opinion polling, and voter turnout and voting behavior.

12. I am also a Senior Columnist for Dr. Larry Sabato's Crystal Ball. The overarching purpose of my writings both at RealClearPolitics and the Crystal Ball is to try to convey a more rigorous understanding of elections than is typically found in journalistic coverage of elections to a lay audience.

13. I am the author of *The Lost Majority: Why the Future of Government is up For Grabs and Who Will Take It*. The book is a revisionist take on realignment theory. It argues that realignments are a poor concept that should be abandoned. As part of this analysis, it conducts a thorough analysis of demographic and political trends from 1920 to the present.

14. I also authored a chapter in Larry Sabato's *Barack Obama and the New America: The 2012 Election and the Changing Face of Politics*, which discussed the demographic shifts accompanying the 2012 elections.

15. I co-authored the 2014 *Almanac of American Politics*. The Almanac is considered the foundational text for understanding congressional districts and the representatives of those districts, as well as the dynamics in play behind elections in those districts. PBS's Judy Woodruff described the book as "the oxygen of the political world," while NBC's Chuck Todd noted that "[r]eal political junkies get two *Almanacs*: one for the home and one for the office."

3

My focus was researching the history of and writing descriptions for the newly-drawn districts, including those in North Carolina.

16.     I previously authored an expert report in *Dickson v. Rucho*, No. 11-CVS-16896 (N.C. Super Ct., Wake County), which involved the drawing of lines for North Carolina's 2012 General Assembly and Senate maps. Although I was not called to testify, it is my understanding that my expert report was accepted without objection.

17.     I am personally agnostic on the wisdom and utility of these particular laws, which raise a host of normative issues that go beyond the realm of objective expert testimony. With that said, the likelihood that these laws will have a significant impact on actual voting, and specifically on minority voting, is overstated by plaintiffs.

## OPINION 1: THE VOTING REFORMS CONTAINED IN HB 589 PLACE THE STATE WITHIN THE MAINSTREAM OF AMERICAN VOTING LAWS.

18.     In support of Opinion 1, I reviewed the relevant sections of the legal codes for all fifty states and the District of Columbia, reports published by the National Conference of State Legislatures, the relevant elections websites of the fifty states and the District of Columbia, and materials provided by counsel which were largely duplicative of the above. On certain occasions, where the laws were ambiguous, I contacted the Secretary of State's office, for each respective state, directly.

19.     Presently, thirty-one states, plus the District of Columbia allow citizens to vote without presenting photographic identification. A number of other states have laws on the books requiring photographic identification, some of which are not yet in force or which have been enjoined. Each of these states is nevertheless characterized as requiring photographic identification to vote, since this opinion involves the comparison of political regimes, not the measurement of the effects of those regimes.

20.     The states described within ¶ 19 are listed in **Exhibit 3**.

21.     Presently, thirty states will reject a ballot cast in the incorrect precinct (for purposes of this opinion, "incorrect precinct" is defined as the precinct in which the voter was not legally authorized to cast a ballot): Alabama, Arizona, Arkansas, Delaware, Florida, Hawaii, Idaho, Indiana, Iowa, Kentucky, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Wisconsin and West Virginia.

22.     Some of the states described within ¶21 allow for same-day voter registration, which would soften any negative impact arising from ballots being cast initially in the incorrect precinct (that is, voters who cast in the incorrect precinct could simply re-register and vote in the correct one). However, these states still do not have the law that plaintiffs would have North Carolina adopt.

23.     Two states, New York and Missouri, allow for a ballot to be counted if it is cast in the incorrect precinct but in the correct polling place – i.e., if a polling place houses multiple precincts and a voter is sent to the wrong line, her vote will still be counted. Because this is a narrow exception and is more restrictive than the previous law in North Carolina, these states are classified here as refusing to count votes cast in the incorrect precinct.

24.     Two more states, Connecticut and Massachusetts, will count ballots cast in the incorrect precinct so long as they are cast in the correct town or city. Because this is a narrow exception – many precincts in Connecticut and Massachusetts are entire towns – and is more restrictive than the previous law in North Carolina, which granted a countywide exception, these states are classified here as refusing to count votes cast in the incorrect precinct.

5

25.     Sixteen states, plus the District of Columbia, count ballots cast in the incorrect precinct. Within this group, states apply a wide array of approaches. Some states, such Louisiana, will only count votes cast for federal races, and then only if the voter voted in the correct parish. Others states, such as Maryland, do not have a "correct-county" requirement and will count votes cast in any race where the voter was eligible to cast a ballot. Regardless, because these states count votes cast for at least some races if they are cast in the incorrect precinct, they were all counted as states allowing out-of-precinct voting. The state laws are summarized in **Exhibit 4**.

26.     Fourteen states allow for in-person early voting in excess of sixteen days, equaling or exceeding the number of days North Carolina allowed for early voting under prior law.

27.     Seventeen states and the District of Columbia allow for in-person early voting, but for time periods of less than seventeen days. One of these states, Colorado, has adopted "vote-by-mail" for upcoming elections. It will, however, maintain traditional polling places as well, although they will function at the county level, rather than the precinct level.

28.     Eighteen states do not allow for in-person early voting. Two of these states, Oregon and Washington, conduct their elections almost entirely by mail. The laws of the states described in ¶28 are summarized in **Exhibit 5**.

29.     In reviewing states' early voter laws, I analyzed Figure 11 of the report of Plaintiffs' expert Charles Stewart, which suggests that that North Carolina moved from being in the mainstream of early voting laws to being an outlier when it shortened the number of days available for in-person early voting. *See* Stewart Decl. Fig. 11.

6

30.     My review of state law brought to light several differences with Dr. Stewart's characterization of early voter laws. An explanation of why there are differences in our charts, some of which are truly judgment calls, follows.

31.     First, although North Carolina may have moved from the median insofar as states that allow early voting are concerned, Figure 11 excludes states that do not allow for no-excuse in-person early voting and therefore do not place North Carolina in a national context.

32.     Dr. Stewart's charts also seemingly include at least one jurisdiction that allows for early voting, but only with an excuse. Virginia law does allow for 43 days of in person absentee voting; however, it does so only if a voter falls into certain narrow categories of excuses (e.g., if the voter will be out of state, Code § 24.2-700(1); is disabled, sick or pregnant, *id.* § 24.2-700(4); is awaiting trial, *id.* § 24-2-700(5); or has a religious objection, *id.* § 24-2-700 (8)).

33.     Virginia does not allow *no-excuse* early voting, in person, absentee, or otherwise. Any comparison to the system in place in North Carolina is necessarily apples-to-oranges, especially when one considers that North Carolina actually has one of the most permissive *no-excuse* absentee ballot programs in place in the United States.

34.     I identified a number of other discrepancies between the data presented in Dr. Stewart's chart – which appear to have been taken from a website maintained by Paul Gronke – a different expert witness for the plaintiffs – and my interpretation of various state laws. For example, he characterizes Colorado as allowing for twelve days of early voting. Colorado law appears to allow for fifteen days of early voting before a general election. Colo. Rev. Stat. Ann. § 1-8-202 ("Early voting shall be made available to any eligible elector in the manner provided in this part during regular business hours for ten days before a primary election and a special

7

legislative election and for fifteen days before a general election or other November election conducted by the county clerk and recorder.").

35.     Dr. Stewart characterizes Idaho as allowing for 43 days of early voting. In Idaho, the times that in-person absentee balloting is available are set at the county level. A call to the Idaho Secretary of State's office suggested that most counties begin their in-person early voting between two and three weeks before the election. I use 18 days for early voting, representing an average of two and three weeks (rounded up).

36.     Dr. Stewart characterizes Illinois as allowing 13 days for in-person early voting. This is true of "traditional" in-person early voting. But Illinois also allows for no-excuse in-person absentee voting, beginning 22 days before the election and ending one day before the election. *See* 10 I.L.C.S. 5/19-1 ("Any qualified elector of the State of Illinois having duly registered where such registration is required may vote at such election as hereinafter in this Article provided."); 5/19-2.1 ("At the consolidated primary, general primary, consolidated, and general elections, electors entitled to vote by absentee ballot under the provisions of Section 19-1 may vote in person . . . . from the 22nd day through the day before the election.").

37.     Dr. Stewart characterizes Kansas as allowing 20 days for early voting. In Kansas, the times that in-person absentee balloting is available are set at the county level. A call to the Kansas Secretary of State's office suggested that most counties begin their in-person early voting around two weeks before the election. I use 14 days because, per a clerk at the Johnson County Election Office, that is the number of days employed by Johnson County, which cast 23.7 percent of the votes in the state of Kansas in 2012, see Dave Leip, *Atlas of United States Elections*, http://uselectionatlas.org/Results, (last visited April 24, 2014).

8

38.    Dr. Stewart does not include Maine on his chart. Maine allows for no-excuse, in-person absentee voting, beginning 30 to 45 days before an election. See Maine Department of Secretary of State, http://maine.gov/sos/cec/elec/absenteeguide.html (last visited Apr. 24, 2014). I use 38 days for early voting, representing an average of 30 and 45 days (rounded up).

39.    Dr. Stewart does not include Minnesota on his chart. Minnesota allows for 46 days of no-excuse, in person absentee voting, beginning in 2014. *See* James Nord, *Most States Have Both Early and No-Excuse Absentee Balloting, but not Minnesota*, MinnPost, June 17, 2013 available at http://www.minnpost.com/effective-democracy/2013/06/most-states-have-both-early-and-no-excuse-absentee-balloting-not-minneso.

40.    Dr. Stewart characterizes Nebraska as allowing for 36 days of early voting. The Secretary of State website suggests that Nebraska allows for 30 days of early voting. *See* Nebraska Secretary of State, http://www.sos.ne.gov/elec/voter_info.html#early, (last visited Apr. 24, 2014).

41.    Dr. Stewart characterizes Nevada as allowing for 14 days of early voting. This characterization is a judgment call. Nevada law provides that "[t]he period for early voting by personal appearance begins the third Saturday preceding a primary or general election and extends through the Friday before election day, Sundays and federal holidays excepted." Nev. Rev. Stat. § 293.3568 (1). Excluding Sundays would provide for twelve days of early voting. But the next subsection empowers county clerks to open early voting stations on Sundays, for a total of 14 days. I use 14 days because, per a clerk at the Clark County Election Office, that is the number of days typically employed by Clark County, although even within the county, the number of days early voting is available varies from site-to-site (Clark County cast 68.1 percent of the votes in the state of Nevada in 2012, see uselectionatlas.org/Results).

9

42.     Dr. Stewart characterizes West Virginia as allowing for 11 days of early voting. The West Virginia Code provides that "[t]he voting period for early in-person voting is to be conducted during regular business hours beginning on the thirteenth day before the election and continuing through the third day before the election. Additionally, early in-person voting is to be available from 9:00 a.m. to 5:00 p.m. on Saturdays during the early voting period." W.Va. Code Ann. § 3-3-3(a). One must therefore exclude the intervening Sunday. This exclusion was confirmed via a call to the West Virginia Secretary of State's office. West Virginia therefore allows for ten days of early voting.

43.     When all of the 49 jurisdictions that do not conduct elections almost entirely by mail are included, the median number of days for early voting in the United States works out to twelve. In other words, North Carolina moved closer to the median state in this country when it shortened its early voting period.

44.     An updated version of Figure 11, showing the relative placement of North Carolina law in 2012 and in 2014, follows in **Figure 1** on the following page:

10

Figure 1



Number of Days of No-Excuse Early Voting, By State

| State | Days |
|-------|------|
| AL | 0 |
| CT | 0 |
| DE | 0 |
| KY | 0 |
| MA | 0 |
| MI | 0 |
| MO | 0 |
| MS | 0 |
| MT | 0 |
| NH | 0 |
| NJ | 0 |
| NY | 0 |
| PA | 0 |
| RI | 0 |
| SC | 0 |
| VA | 0 |
| OK | 4 |
| MD | 6 |
| LA | 8 |
| FL | 8 |
| NC2014 | 10 |
| WV | 10 |
| UT | 11 |
| WI | 12 |
| HI | 12 |
| TX | 12 |
| DC | 13 |
| NV | 14 |
| KS | 14 |
| CO | 15 |
| NM | 15 |
| ND | 15 |
| AR | 15 |
| AK | 15 |
| TN | 16 |
| NC2012 | 17 |
| ID | 18 |
| GA | 19 |
| IL | 21 |
| AZ | 23 |
| IN | 28 |
| CA | 30 |
| NE | 30 |
| OH | 32 |
| ME | 38 |
| WY | 40 |
| IA | 40 |
| VT | 45 |
| MN | 46 |
| SD | 47 |

11

45.     Presently, eleven states, plus the District of Columbia, allow same-day registration. These state laws are summarized in **Exhibit 6.**

46.     One state, Alaska, allows for same-day registration, but only for the purpose of voting for President or Vice President of the United States. *See* State of Alaska Division of Elections, http://www.elections.alaska.gov/vi_hv_vote_pres.php (last visited Apr. 24, 2014). Because of the narrowness of the exception, which is substantially narrower than the standard plaintiffs would have North Carolina adopt, Alaska was not treated as a state that allows for same-day registration.

47.     North Dakota does not have a voter registration law. It is therefore treated as allowing for same-day registration.

48.     Six states, plus the District of Columbia, allow pre-registration at the age of sixteen. These state laws are summarized in **Exhibit 7.**

49.     North Dakota does not have a voter registration law. It is therefore treated as allowing for pre-registration at age 16.

50.     **Figure 2** summarizes the data described above by displaying, graphically, the number of states that employ various iterations of the five laws detailed above.

51.     Illinois does not require photographic identification to vote, allows out-of-precinct voting, and has an early voting period in excess of 16 days. It does not, however, allow for pre-registration at the age of 16, and does not allow for same-day registration. It therefore employs three of the approaches to voting that plaintiffs would require North Carolina to adopt. It is therefore coded as a "three" for purposes of Figure 2.

52.     Alabama, by contrast, requires photographic identification to vote, does not allow out-of-precinct voting, does not have an early voting period in excess of 16 days, does not allow

12

for pre-registration at the age of 16, and does not allow for same-day registration. It is therefore coded as a "zero." North Carolina is likewise coded as a "zero."



Fig. 2: Number of States That Implement "n" Laws at Issue In This Case

53. No United States jurisdiction currently has all five voter laws that the plaintiffs would require the state of North Carolina to adopt.

54. Five jurisdictions have adopted any four voter laws that the plaintiffs would require the state of North Carolina to adopt. They are California, Colorado, the District of Columbia, North Dakota, and Wyoming.

55. California and Wyoming do not have pre-registration at age 16, while Colorado, the District of Columbia and North Dakota do not offer in person early voting in excess of sixteen days.

56. Seven jurisdictions have adopted any three voter laws that the plaintiffs would require the state of North Carolina to adopt. They are Illinois, Iowa, Maine, Maryland, Minnesota, Oregon and Washington. It should be noted that Oregon and Washington are

13

classified here as not allowing for in-person early voting, even though this is merely a function of the fact that they effectively do not allow for in-person voting at all.

57.    Thirteen jurisdictions have adopted any two forms of voter law that the plaintiffs would require the state of North Carolina to adopt. They are Alaska, Arizona, Connecticut, Delaware, Georgia, Hawaii, Idaho, Montana, Nebraska, New Jersey, New Mexico, Ohio, and Vermont.

58.    Seventeen jurisdictions have adopted any one voter law that the plaintiffs would require the state of North Carolina to adopt. They are Florida, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Missouri, Nevada, New Hampshire, New York, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Utah, West Virginia and Wisconsin.

59.    Kentucky, Massachusetts, Missouri, Nevada, New York, Oklahoma, Utah and West Virginia allow voters to cast ballots without providing photographic identification. Kansas, Louisiana, Pennsylvania and Rhode Island count ballots cast in the incorrect precinct. Indiana and South Dakota have early voting periods in excess of 16 days. New Hampshire and Wisconsin allow for same-day registration. Florida allows voters to pre-register at the age of sixteen.

60.    Nine jurisdictions have adopted none of the voter laws that the plaintiffs would require the state of North Carolina to adopt. They are Alabama, Arkansas, Michigan, Mississippi, North Carolina (as of today), South Carolina, Tennessee, and Virginia.

61.    The experiments of the North Carolina legislature during the 2000s effectively created an outlier in United States election law, at least insofar as the laws at issue in this litigation are concerned. Collectively, they rendered North Carolina the only state in the union that did not require a photographic identification to vote, that counted ballots cast in the wrong

14

precinct, that allowed for a period of early voting in excess of 16 days, that allowed voters to register on election day, and that allowed voters to pre-register at the age of sixteen.

### OPINION 2: THE DATA DO NOT CONSISTENTLY SUPPORT THE TURNOUT EFFECTS PREDICTED BY PLAINTIFFS.

62.     Plaintiffs' experts amass a voluminous combination of both data and anecdote in support of their argument that HB 589 should result in a substantial decline in African American voting participation. For example, in support of his contention that the termination of same-day registration would result in a diminution in African American registration, Dr. Stewart observes the creation of a "spike" in voter registration after the original registration deadline passes. Stewart Declr., ¶ 80, fig. 4. Theoretically, then, the elimination of same-day registration should eliminate many of the voters who opted to register late. Dr. Burden also proceeds from theory, propounding a Downsian model of voting, where increasing burdens on voting rights inherently restrict voting. Burden Rep't., at 3. Dr. Gronke observes that the early voting population is disproportionately made up of African American voters, and, drawing on the example of Florida, posits that these voters would be disproportionately affected by a reduction in the number of days of early voting. Gronke Declr., ¶29-¶31.

63.     The overarching problem with these approaches comes in the transition from theory to practice. In short, with a few exceptions, plaintiffs' experts assume largely stagnant responses to changing incentives. Even accepting, arguendo, their demonstration that African Americans disproportionately (a) fail to have voter identification; (b) use early voting; (c) advantage themselves of same day registration (during the early voting period); (d) take advantage of pre-registration at the age of 16; and (e) cast ballots in the incorrect precinct, there is little evidence that these voters would fail to adjust their behaviors accordingly in the presence of laws requiring photographic identification and in the absence of laws encouraging early

15

voting, permitting same day registration, permitting pre-registration at the age of 16, and allowing out-of-precinct voting. Indeed, the data suggest that this result is exactly what occurred in states that did not have these sorts of laws in place.

64.     Moreover, much if not all of what plaintiffs' experts describe, especially respecting the increase in turnout that occurred during the 2000s, is a result of exogenous forces converging upon the state. They offer almost no consideration of North Carolina's transition from a noncompetitive state (in presidential elections) to a competitive state, of the vast sums of money poured into the state over the past two cycles, of the historic nature of the Obama candidacy (though passing reference is sometimes made, see Burden Declr. at 6), and of the changing strategies of the parties. In my opinion, it is impossible to do a proper analysis without at least attempting to take these factors into account.

65.     Plaintiffs' experts also conflate the midterm electorate with the presidential electorate, notwithstanding the fact that the two electorates have become very different. In fact, while African American vote strategies have shifted in midterm electorates, albeit not to the extent that occurred in presidential electorates, there has been almost no increase in African American participation in midterm elections over the past sixteen years, notwithstanding the steady liberalization of North Carolina's election laws.

66.     These effects hopelessly complicate plaintiffs' experts' conclusions that the increased minority turnout is a function of North Carolina's progressively liberalized voting regime, and that the alterations in that regime will reduce this turnout. Instead, these effects are largely a function of the fact that the historic nature of the Obama campaign generated massive enthusiasm among African American voters; that the Obama campaign, sensing that North Carolina was winnable given overall political conditions, funneled massive resources,

16

unprecedented in recent years, into the state in an attempt to increase African American turnout and capitalize fully upon this enthusiasm; and that the Obama campaign's efforts were successful. But these effects seem to be transitory and are not replicated when Obama is not on the ballot and, importantly, do not seem to correlate nationally with the liberalization of a state's election regime.

### The Current Population Survey Data, and a Comparison of Two States

67. The problem with this transition from theory to practice is neatly summed up by the succeeding four charts, which rely on data obtained from the Current Population Survey, or CPS. The CPS is a monthly survey, conducted by the United States Census Bureau, which is usually used to calculate the unemployment rate.

68. But every even numbered year, a few weeks after the general election, the CPS asks respondents about their participation in that election. The results are published in a document with the title "Voting and Registration in the Election of [year]."

69. The CPS has an enormous sample size, which allows for significantly more granular analysis than researchers can obtain from other surveys, such as the exit polls or the American National Election Study. Because voters are required to respond to the CPS, it lacks many of the problems with nonresponse bias that pervade other modern surveys.

70. The CPS is admittedly imperfect, both because some respondents return the survey but fail to answer the questions about voting, and because respondents tend to overstate the rate at which they participate in elections. Some of these changes are likely systemic, albeit at a national level. *See, e.g.,* Michael P. McDonald, "2012 Turnout: Race, Ethnicity and the Youth Vote, *Huffington Post,* http://www.huffingtonpost.com/michael-p-mcdonald/2012-turnout-race-ethnict_b_3240179.html (last visited Apr. 24, 2014).

17

71.     In addition, there is a break in the data series beginning in 1996, when the census began to make available data for citizenship. But for generating cross-state comparisons, the CPS is best dataset we have.

72.     Consider the following two charts. They represent the share of the African American population that is registered to vote, as well as the share of the African American population that reported participating in the 2012 elections in two states.





73.     As you can see, beginning in the middle of the 1990s, state "B" catches up with state "A" in terms of African American registration and voting participation rates. After that, African American registration and voting participation increase at roughly the same rates in both states.

74.     The following two charts represent the same data as the preceding two charts, only with the states labeled:





75.     The dashed line represents African American participation in voter registration and actual voting in the state of Mississippi. The solid line represents African American participation in voter registration and actual voting in the state of North Carolina.

76.     During the time period represented in Figures 3-6, North Carolina greatly relaxed its restrictions on voter registration and voting. In 1999, the Democratic legislature in North Carolina instituted no-excuse early voting. In 2001, it extended the early voting period to seventeen days. In 2005, in response to a disputed election, see *James v. Bartlett*, 359 N.C. 260 (2005), the Democratic legislature codified the legality of provisional ballots cast in the incorrect precinct. In 2007, North Carolina instituted same-day voter registration. *See, e.g.*, Lawson Declr., ¶ 10.

77.     North Carolina experienced an increase in African American participation subsequent to the enactment of these laws. *E.g.*, Lawson Declr., ¶ 10, 11.

78.     But during the same time period, African American participation increased in Mississippi at a similar rate. *See also* Leloudis Rep't, at 31. Yet Mississippi is a state that does not count ballots cast out-of-precinct, does not allow for early voting in excess of sixteen days – indeed it doesn't allow for early voting at all – does not allow for same-day voter registration, and does not allow pre-registration at the age of sixteen.

79.     In fact, in 2012, the three states where African American turnout was the highest – Wisconsin, Mississippi, and North Carolina – had what we might term middling, low, and highly permissive voting regimes in place, respectively. Likewise, the states with the lowest percentage of African American voter turnout – Arizona, Arkansas and Washington – have legal regimes that might be characterized as middling, low, and middling in terms of permissiveness. *See* Philip Bump, *A State-By-State Look at the Record Black Turnout in 2012*, The Wire, (May 9,

2013), http://www.thewire.com/politics/2013/05/black-turnout-2012-state-by-state-maps/65053/, cited in Leloudis Declr. at n.85.

80.    If plaintiffs' experts' theory is correct, what we would expect to see in such circumstances is that African American participation would increase dramatically in North Carolina, while lagging badly in Mississippi. Instead, despite two entirely different voting regimes, both states experienced similar increases in African American registration and participation.

81.    The foregoing is not meant as a dispositive analysis, but rather illustrates the difficulty with making the jump from theory to practice that plaintiffs' experts attempt to make.

### Historic African American Participation Nationally, and within North Carolina

82.    The increased participation of African American voters in North Carolina has to be viewed in the national context, as well as in the broader context of the state.

83.    The story of African American voting participation in the United States is one of gradual improvement and increasing parity with non-Hispanic white voting participation.

84.    Figure 7 displays the rate at which African Americans participated in United States presidential elections, from 1972 through 2012, according to CPS data. Prior to 2000, the data represent voting as a share of the adult population, while afterwards, the data represent voting as a share of the adult citizen population.

85.    Participation is roughly flat from 1972 through 1996. Then, beginning in 1996, it begins to climb upward gradually, improving from 51 percent in 1996, to 57 percent in 2000, to 60 percent in 2004, to 65 percent in 2008, to 66 percent in 2012.

21



Fig. 7: African-American Participation In Voting, Nationally

86.     During this time period, African American participation has converged on the non-Hispanic white participation nationally. But that convergence has been gradual. According to the CPS data, African American voting participation rates were 82 percent of those of the non-Hispanic white population in 1984, 87 percent in 1988, 85 percent in 1992, 90 percent in 1996, 92 percent in 2000, 89 percent in 2004, 98 percent in 2008, and 104 percent in 2012.



Fig. 8: African American Voting Participation As A Percentage of White Participation

22

87.     The steady correlation between African Americans' convergence upon non-Hispanic white levels of participation is tight. If one conducts a simple OLS regression analysis with year as the independent variable and the African American participation rate as a share of the non-Hispanic white participation rate, one explains 81.5 percent of the variance, and the time variable is highly significant (p=.001); it is, if you will, outside the error margin.

88.     The increase in African American participation in North Carolina is likewise a secular phenomenon, as illustrated by Figure 6 above.

89.     Figure 9 illustrates African American voting rates in North Carolina and in the United States of America.



90.     The two trendlines largely move in tandem. Eight-four percent of the movement in the rate of African American voter participation in North Carolina can be explained simply with respect to national trends.

### North Carolina's Emergence As a Target State

91.     While the changes to North Carolina's voting laws were taking place, outside forces were conspiring to alter the makeup of the North Carolina electorate. To the surprise of many, North Carolina became a swing state.

92.     This transition can be best analyzed by examining the state's Partisan Index. By Partisan Index, I mean how Democratic or Republican the state is, when compared to the country as a whole.

93.     A state's Partisan Index is computed by subtracting the share of the state that voted for the Republican presidential candidate from the share of the nation that voted for Republican presidential candidate. For purposes of these calculations, third parties are excluded.

94.     To illustrate the utility of the Partisan Index, consider the following example. In 1984, Ronald Reagan won 51.4 percent of the two-party vote in Massachusetts. In absolute terms, one could consider Massachusetts a swing state. But no one would have considered Massachusetts a swing state, because it had two Democratic senators, a Democratic governor, and an overwhelmingly Democratic legislature. Ten of the state's eleven congressional districts elected Democrats, and the one Republican, Silvio Conte, was very liberal Republican.

95.     Moreover, one would conclude that, using absolute terms, Massachusetts has swung wildly toward Democrats in the interim, since Barack Obama won 61.8 percent of the two-party vote in the state in 2012.

96.     But Reagan's 51.4 percent win in Massachusetts has to be viewed in the context of his winning 59.2 percent of the two-party vote nationally. Compared to the country as a whole, Massachusetts actually had a Democratic lean of 7.8 points in 1984.

97.     Likewise, Obama's 61.7 percent win in Massachusetts has to be viewed in the context of his winning 52 percent of the two-party vote nationally. Compared to the country as a

24

whole, Massachusetts actually had a Democratic lean of 9.8 points in 2012. Viewed in this light, Massachusetts has actually had relatively stable politics since 1984, with only a slight shift toward Democrats.

98. Figure 10 shows the Partisan Index of North Carolina from 1972 through 2012.



99. In 1976, and again in 1980, the state was roughly four points more Democratic than the country as a whole. Over the next four cycles, the state gradually trended toward Republicans. By 1996, the state was 7.3 points more Republican than the country as a whole.

100. But in 2000, the state began moving back toward Democrats; it was only 6.7 points more Republican than the country as a whole that year. It did so despite the fact that neither the Bush campaign nor the Gore campaign spent significant sums of money in the state. *See* David B. Magleby, ed., *Financing the 2000 Election* 98 (2002).

101. This leftward shift was noticed by Democrats and political demographers, who speculated that the growth of suburbs around Charlotte and especially in the Research Triangle Park area would make the state increasingly fertile ground for the Party of Jackson. John Judis and Ruy Teixeira, writing in 2002, observed that Democrats like John Edwards were creating a

25

new rapport with upscale voters in what they called "postindustrial areas" or "ideopolises." As they wrote "[s]ince 1988, all these areas have become more Democratic. Dukakis lost Mecklenburg County 59-40 percent in 1988, but Gore lost it only 51-48 in 2000, even though he did not campaign in the state. The Democrats' edge in Durham County increased from 54-45 percent to 63-35 percent over the time period." John Judis & Ruy Teixeira, *The Emerging Democratic Majority* 111 (2002). They predicted that over the course of the next decade, the state would lean Republican, but would become very competitive. *Id.* at 116.

102.    In part because of the popularity of *The Emerging Democratic Majority*, Democratic interest in North Carolina increased. In 2004, John Kerry placed Sen. John Edwards of North Carolina on the Democratic ticket as his running mate. There was some hope that Edwards would make the state competitive. *See* Jamison Foser, *CNN Read Minds, Not Polls, Wrote Off Kerry-Edwards Chances in North Carolina*, MediaMatters for America, (July 7, 2004), http://mediamatters.org/research/2004/07/07/cnn-read-minds-not-polls-wrote-off-kerry-edward/131397. Ultimately, neither the Bush campaign nor the Kerry campaign spent money on advertising in North Carolina. *See* America Votes 2004, http://edition.cnn.com/ELECTION/2004/special/president/campaign.ads/. Nevertheless, the state continued to move toward Democrats, voting only five points more Republican than the country as a whole.

103.    In 2008, Barack Obama invested heavily in the state of North Carolina, both in the crucial Democratic primary and in the general election. Obama spent over $15 million in advertising, compared to just $3.8 million in advertising by the McCain campaign. *See* Election Tracker: Ad Spending, http://www.cnn.com/ELECTION/2008/map/ad.spending/.

104. At the same time, the Obama campaign invested heavily in on-the-ground voter mobilization efforts. Across the country, the Obama campaign established nearly twice as many field offices as the McCain campaign. Seth E. Masket, *Did Obama's Ground Game Matter? The Influence of Local Field Offices During The 2008 Presidential Election*, 73 Public Opinion Quarterly 1026 (2009). These offices ultimately had a statistically significant effect on Democratic turnout, sufficient to flip the state of North Carolina. *Id.* at 1032.

105. These offices focused on local registration drives and on early voting in particular, in an attempt to "bank" votes for Election Day. Jim Messina, Obama's then-chief of staff, in a discussion about the campaign's concerns about holding big rallies in the wake of John McCain's "Britney Spears" commercial, commented "[f]inally, at the end of September we got back to saying, 'Look, we're gonna do this again because we need to push early voting,' and if you're gonna push early voting and voter registration you've gotta do big events." Ryan Lizza, *Battle Plans: How Obama Won*, The New Yorker (Nov. 17, 2008), http://www.newyorker.com/reporting/2008/11/17/081117fa_fact_lizza?currentPage=all.

106. This was part of what national field director Jon Carson called the "Starbucks strategy." As he explained "[w]e wanted offices everywhere because, despite all the focus on the online network, the truth of the matter was where we had offices and volunteers working together with staff, we got work done." Kathleen Hall Jamieson, *Electing the President 2008* 43 (2009).

107. Carson continued "Our Get out the Vote (GOTV) efforts were the culmination of this empowerment strategy. We went after weak voting Democrats wherever they were. In southeast Ohio, we were knocking on doors in precincts that had never seen it before. Our organization allowed us to do that." *Id.* 45.

Case 1:13-cv-00658-TDS-JEP   Document 136-5   Filed 06/18/14   Page 28 of 73

108. Early voting in particular was a target of the Obama campaign. Carson stated "[i]f you're a fired up 64-year-old grandmother, and we told you how to vote early, you're going to make sure your sporadic voting kids and grand kids are doing it too. So that was the strategy." *Id.* at 46.

109. Notably, in states that didn't have early voting, the Obama Administration employed different strategies to get out the vote, such as traditional advertising, in an attempt to stave off any late shift in voting patterns. *Id.* at 47.

110. The Obama campaign also worked diligently at registering new voters, African Americans in particular. E.g., Eli Saslow, *Democrats Registering In Record Numbers*, Wash. Post (Apr. 28, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/04/27/AR2008042702272.html, William M. Welch, *Study: Voter Interest High, Registrations Up*, USA Today (Nov. 2, 2008), http://usatoday30.usatoday.com/news/politics/election2008/2008-11-02-vote_N.htm?csp=34,

111. As a result of these efforts, North Carolina, compared to the country as a whole, moved further toward the Democrats. Although it was nevertheless still more Republican than the country as a whole, the state of the economy and widespread discontent with the Bush Administration created a national atmosphere that enabled Obama to win a state that, in absolute terms, was 3.5 points more Republican than the country as a whole in relative terms.

112. In 2012, both campaigns spent heavily on advertisements in North Carolina. Republicans spent $57 million, while Democrats spent $40 million. *See* http://www.washingtonpost.com/wp-srv/special/politics/track-presidential-campaign-ads-2012/. This time, Republicans notched a victory in the presidential election. Nevertheless, once national

Case 1:13-cv-00658-TDS-JEP   Document 136-5   Filed 06/18/14   Page 29 of 73

effects are taken into account, the state continued its march toward Democrats. The state leaned toward Republicans by three points.

113.    The shift in North Carolina voting patterns cannot be evaluated in a vacuum, and cannot readily be chalked up to the increasingly liberal voter access laws enacted during this time. The shift in North Carolina was predicted by demographers without respect to these laws, begins prior to the full enactment of these laws, and continues even after they are fully in place.

114.    Instead, the movement of North Carolina toward Democrats – as well as the increased African American participation in elections – is a complex phenomenon, which owes much to demographic trends among whites in urban areas, the decisions of the various parties and campaigns to target the state, and to target certain sorts of turnout at issue in this case in particular. It is not simply that African Americans expressed a preference for early voting. The Obama team knew that a vote that was cast could never be revoked, and that "banking" early votes was the most surefire way to keep a late shift from occurring. Because African Americans are one of the most heavily Democratic constituencies in the country, this was one of the substantial foci of Team Obama's efforts.

115.    Thus, these effects are present even in states without liberal voter laws. In Georgia, for example, political scientists have concluded that "the 13% increase in black turnout (see Table 2) essentially closed the racial gap in voting, and these high rates of mobilization speak to the significance of the opportunity to elect the first African American president." Seth C. McKee, et al., *Achieving Validation: Barack Obama and Black Turnout in 2008*, 12 State Politics & Policy Quarterly (2012), 16.

Case 1:13-cv-00658-TDS-JEP    Document 136-5    Filed 06/18/14    Page 30 of 73

116.    These conclusions dovetail with what we observed above: The increase in African American participation in North Carolina cannot be divorced from national effects. It was broad based, and was largely commensurate with national and historic trends.

**Cross-State Comparison**

117.    Perhaps the best way to summarize the difficulty in conducting an analysis that pays little attention to outside effects and the potential change in behavior of voters in response to different incentives is to look at African American turnout in every state with respect to the various laws that plaintiffs would require the State of North Carolina to adopt.

118.    Figure 11 lists the states for which the CPS has an unbroken data series of African American voter participation between 2000 and 2012. The second column – by which the data are sorted – shows the increase in African American voter participation between 2000 and 2012. The third column shows the number of laws that plaintiffs would require the State of North Carolina to adopt that were in place in each state. Because so many voter identification laws have been enjoined or were only passed in the wake of the 2012 elections, such laws are excluded from this analysis.

| Fig. 11: Change in African American Participation vs. Permissiveness of State Voting Laws | | |
|---|---|---|
| State | Change in African American Participation, 2000-2012 | Number of Laws Adopted |
| Kansas | -8.8% | 1 |
| Alabama | 5.4% | 0 |
| Arizona | 12.0% | 1 |
| Arkansas | -3.2% | 0 |
| California | 6.6% | 3 |
| Colorado | 6.5% | 2 |
| Connecticut | 9.6% | 1 |
| DC | 5.0% | 3 |
| Delaware | 8.5% | 1 |
| Florida | 4.7% | 1 |
| Georgia | 11.4% | 2 |
| Illinois | 3.3% | 2 |
| Indiana | 16.7% | 1 |
| Kentucky | 4.3% | 0 |
| Louisiana | 6.7% | 1 |
| Maryland | 2.4% | 2 |
| Massachusetts | 6.1% | 0 |
| Michigan | 1.7% | 0 |
| Minnesota | 17.0% | 2 |
| Mississippi | 24.0% | 0 |
| Missouri | -2.4% | 0 |
| Nevada | 21.2% | 0 |
| New Jersey | 16.1% | 1 |
| New York | 12.8% | 0 |
| North Carolina | 32.3% | 4 |
| Ohio | 16.4% | 1 |
| Oklahoma | 10.3% | 0 |
| Pennsylvania | 2.0% | 1 |
| South Carolina | 8.1% | 0 |
| Tennessee | 8.5% | 0 |
| Texas | 4.5% | 0 |
| Virginia | 13.3% | 0 |
| Washington | 9.7% | 2 |
| Wisconsin | 13.0% | 1 |

119.    North Carolina witnessed the largest increase in African American participation since 2000. But the states that experienced the second- and third- largest increase in African American participation had adopted none of the laws that plaintiffs would require North Carolina to adopt.

120.    Note too that Indiana had the fifth-largest increase in African American participation in the nation during this time, despite the implementation of a voter identification

31

law that many feared would substantially inhibit African American participation. *E.g.*, Brief of *Amicus Curiae*, United States Congressman Keith Ellison, in Support of Petitioners, *Crawford v. Marion County Election Bd.* (Nov. 12, 2007). In fact, from 2004 to 2008, Indiana's African American participation rates increased 7.1 percent, outstripping both North Carolina's increase from that cycle (3.7 percent) and the national average (4.7 percent). They increased another 7 percent from 2008 to 2012.

121. But rather than eyeball the data, the best way to test for any effects here is to conduct a regression analysis, despite the complications such an analysis might entail. A simple regression does reveal a positive correlation between the number of laws a state passes and the increase in African American participation between 2000 and 2012. The effect is small, however, and is not statistically significant at 95% confidence (p=.18). If you will, it is within the "margin of error." Nor is much of the variance explained ($r^2$=.0247).

122. But adding in a few basic controls weakens, rather than strengthens, the relationship between the liberality of voting laws and the increase in African American turnout. For example, drawing on my experience as a psephologist and knowledge of United States elections, I classified states as either contested or uncontested in both 2000 and 2012. States that were contested in 2000 but uncontested in 2012 (Arkansas, California, Missouri, New Mexico, Oregon, Tennessee and Washington) were coded as -1, while states that were contested in 2012 but not in 2000 (Colorado, Nevada, North Carolina and Virginia) were coded as 1. The remainder was coded as zero.

123. Re-running the regression with this control in place reduces the significance of the "laws" variable further (p=.246), while target state status becomes highly significant (p=.0085). The $r^2$ jumps to .197.

32

124.     Moreover, a state that had lower African American turnout in 2000 necessarily had more room to grow, and might be expected to enjoy more of a surge in turnout. If we add a control for African American turnout in 2000, both it and the target state variable return as statistically significant (p=.014 and p=.012, respectively). The "laws" variable becomes even less significant (p=.318). The $r^2$ increases to .322.

125.     Performing the same analysis for each law individually results in similar conclusions. Adopting pre-registration at age 16 has no statistically significant correlation with African American turnout (p=.54). Implementing same-day registration has no statistically significant correlation with African American turnout (p=.98). Counting ballots filed out of precinct has no statistically significant correlation with African American turnout -- indeed, what correlation there is suggests a negative effect on turnout (p=.134). Nor does the number of days for early voting correlate with African American turnout (p=.569).

**Midterm Elections**

126.     Perhaps the best piece of evidence that North Carolina's surge in African American participation was largely a function of the Obama campaign and national forces is the fact that it has not been replicated in midterm elections. If the surge in participation really were a result of the voter laws, we should expect to see it roughly replicated in every election. We do not, however, see such an effect.

127.     Plaintiffs' expert Lichtman argues that "Presidential election turnout is most appropriate for cross-state comparison because state-specific factors such as the presence or absence of competitive statewide elections in other years can influence turnout." Lichtman Declr. at 2. It is unclear why this would be the case. First, states have Senate elections (at least) every two of three elections. Second, it is unclear why one would not be able to control for these

33

effects, at least any less than one could control for the transition of a state from swing state to competitive status.

128.    Figure 12 shows African American participation in North Carolina midterm elections from 1998 through 2010.



**Fig. 12: African American Voting Participation in North Carolina Midterm Elections, 1998-2010**

129.    The trendline is more-or-less flat. Overall, African American participation was up 2.7 percent between 1998 and 2010. Despite the liberalization of North Carolina election laws, this lagged non-Hispanic white participation, which was up 5.1 percent between 1998 and 2010.

130.    Using 1998 as a baseline gives us a good basis for comparison. North Carolina hosted a competitive election in 1998, between Republican Sen. Lauch Faircloth and Democratic candidate John Edwards. It hosted another competitive election in 2002, between Republican candidate Elizabeth Dole and Democratic candidate Erskine Bowles. In 2006, there was no Senate race, and participation dropped accordingly. In 2010, there was another competitive election featuring Republican Sen. Richard Burr and Democrat Elaine Marshall.

131.    Table three in Dr. Kousser's report likewise shows the regression-to-mean that has occurred in midterm elections. In 2008, 71.5 percent of African Americans voted early,

34

compared to 51.1 percent of whites, a difference of 20.4 points. In 2012, the difference was 18.6 points. But in 2004, the difference was 3.2 points in white voters' favor, which grew to a 7.4 point advantage in 2006. African Americans disproportionately used early voting in 2010, but the differences were slight; 36.2 percent of African Americans voted early compared to 33.3 percent of whites, a difference of 2.9 percent. Kousser Rep't, at Tbl. 3. These data do not suggest that there is some inherent socioeconomic preference for early voting among African Americans; but rather that the strategies of national campaigns – not the structure of the legal regime -- play a predominate role in when African Americans vote, not the structure of the legal regime.

132. The significance of the campaign strategy is reinforced by Dr. Gronke's work. Examine the chart on page 11, but exclude 2008 and 2012. The chart then suggests that, in the South as a whole, whites utilized early voting at a 3.7 percent higher rate in 2000 than African Americans. In 2002, that difference was 2.76 percent. In 2004, it was 5 percent. In 2006, it was 5.22 percent. In 2010, the difference was 1.71 percent. Gronke Declr., at 11.

133. We have two case studies where African Americans utilized early voting at significantly higher rates than whites. Both of these scenarios involved a presidential campaign featuring an historic figure targeting those voters specifically to vote early. What is effectively one observation is insufficient evidence around which to build a revised turnout model.

134. A similar revision to Prof. Gronke's chart (on page 15 of his expert report) reveals a similar phenomenon. If we exclude the years where the Obama campaign was active, this is what we see:

35



Fig. 13: North Carolina Rates of Early In-Person Voting By Race, 2008 and 2012 Excluded

135.     Figure 14 shows how North Carolina compares to other states in midterm elections. Despite having implemented all four of the voter laws that plaintiffs would require the state of North Carolina to adopt today, North Carolina's increase in voter participation from 1998 to 2010 was below the median for the country as a whole. The relationship between the number of laws passed and the change in turnout was not statistically significant (p=.97), and in fact the coefficient suggests a negative relationship (b=-.00046). Controlling for baseline African American participation and whether the state had a competitive race in 1998 and/or 2010 helps the significance of the "laws" variable somewhat, but it does not begin to approach significance (p=.792001).

36

| Fig. 14: Change in African American Voting Participation vs. Permissiveness of State Voting Laws | | |
|---|---|---|
| State | Change in African American Participation, 1998-2012 | Number of Laws Adopted |
| Michigan | -8.9% | 0 |
| Maryland | -7.1% | 2 |
| DC | -6.4% | 3 |
| Alabama | -5.4% | 0 |
| Ohio | -4.4% | 1 |
| Illinois | -4.0% | 2 |
| Tennessee | -2.7% | 0 |
| Massachusetts | -2.4% | 0 |
| California | -1.9% | 2 |
| New York | -0.6% | 0 |
| Indiana | -0.6% | 1 |
| Florida | 1.3% | 1 |
| Arkansas | 1.4% | 0 |
| Texas | 2.0% | 0 |
| Louisiana | 2.6% | 1 |
| North Carolina | 2.7% | 0 |
| Nevada | 4.6% | 0 |
| Oklahoma | 5.1% | 0 |
| New Jersey | 5.7% | 1 |
| Georgia | 5.9% | 2 |
| Pennsylvania | 7.5% | 1 |
| Kentucky | 7.9% | 0 |
| Mississippi | 8.3% | 0 |
| Wisconsin | 10.2% | 1 |
| Virginia | 10.7% | 0 |
| South Carolina | 10.9% | 0 |
| Connecitcut | 11.8% | 0 |
| Missouri | 12.7% | 0 |
| Arizona | 13.9% | 1 |
| Washington | 15.5% | 2 |
| Colorado | 16.6% | 2 |
| Minnesota | 18.1% | 2 |
| Kansas | 19.1% | 1 |
| Delaware | 21.9% | 1 |

### The Florida Example

136.    Plaintiffs' experts do offer one cross-state example, drawing parallels between the
consequences observed in Florida's decision to shorten early voting and the likely outcome in
North Carolina.

37

137.    While it is always risky to draw broad conclusions based upon a single observation, there are additional reasons to believe that the Florida example is not apposite.

138.    The Florida example is most thoroughly explained in the reports of Drs. Gronke and Stewart. *E.g.*, Gronke Declr. ¶¶30-38. To summarize briefly, Florida shortened its early voting time period before the 2012 elections, which may have contributed to a lengthening of lines in early voting on Election Day. A working paper from Drs. Gronke and Stewart concludes that the result of this was a decline in the number of votes cast during the early voting period, from 2,663,995 to 2,380,165 in 2012. This decline disproportionately affected African Americans.

139.    Dr. Stewart notes that the decline did not actually come from the voters who voted on the days where early voting was cut. These voters were the most committed voters. Stewart Declr. ¶203. This conclusion makes intuitive sense -- the most committed voters were the most eager to vote, and turned out the earliest. When the early voting period was shortened, committed voters were not discouraged. Rather, it was the less-motivated voters, who had waited until late in the cycle to vote in 2008, who did not return.

140.    Obviously sorting out causation here is difficult, but the above does raise the question: Why should we necessarily conclude that these less motivated voters from 2008 stayed home because of the lines? *See* Stewart Declr. ¶ 206. Perhaps they stayed home simply because they were less motivated to vote. After all, 2012 saw lower turnout nationally than in 2008.

141.    Significantly, although early voting was down in Florida, overall voting was not, suggesting an overall shift in voting strategies from early voting to Election Day voting. *See* Dave Leip, Atlas of United States Elections, http://uselectionatlas.org/Results, (last visited April 24, 2014). This shift contrasts with a generalized decline in turnout nationwide:

38

| Fig. 15: Early versus Total Voting in Florida, 2008-2012 | | | |
|---|---|---|---|
| | Early Voting Florida | Total Voting in Florida | Total Voting in USA |
| 2008 | 2,663,995 | 8,412,248 | 131,473,705 |
| 2012 | 2,380,165 | 8,492,175 | 129,232,106 |
| Absolute Change | -283,830 | 79,927 | -2,241,599 |
| Percent Shift | -10.7% | 1.0% | -1.7% |

142.    Of course, Florida's population grew during the interim (as did the United States' population). Overall, voter *participation* was down in Florida. But the CPS data suggest that the decline was concentrated among non-Hispanic whites, rather than African Americans. From 2008 to 2012, participation was down 3.3 percent among non-Hispanic whites, but only .9 percent among African Americans.

143.    The data suggest an alternate narrative. Rather than long lines incentivizing marginal early voters to stay home, marginal early voters failed to vote because they were marginal voters, and the dreary 2012 campaign failed to match fully the excitement of the historic 2008 campaign. In other words, the overall decline in African American participation in Florida's early voting period was not a manifestation of longer lines, but was simply a manifestation of declining interest overall. To the extent that it was a manifestation of longer lines, the voters who were interested in voting shifted their voting strategies to Election Day accordingly. Again, if plaintiffs' overall theory were correct, we should expect to see more significant declines overall among African Americans than non-Hispanic whites, given the former's supposed preference for early voting as a means of exercising their franchise.

144.    This is not to suggest that Drs. Gronke and Stewart are conclusively wrong. These may be two distinct phenomena – one set of inputs may have led to the decline in participation among African Americans while another set of inputs may have encouraged the decline in

39

participation among whites. This analysis does, however, illustrate the difficulty in drawing broad conclusions on the basis of a single observation.[1]

**Scholarly Literature**

145. The above-stated conclusions are supported by scholarly literature. This literature has had difficulty identifying any consistent correlation between vote reform and turnout, even among minority groups. Given the conflicting nature of the peer-reviewed scholarly literature regarding the effects of these laws on turnout, it is difficult to conclude that we should expect a decline in participation in North Carolina.

146. For example, Roger Larocca and John S. Klemanski, examining the 2000, 2004 and 2008 returns, do find a positive correlation between voting rates and no-excuse absentee voting – endorsed by the state of North Carolina – and also with same day registration. However, they find that early in person voting has a negative correlation with turnout. Roger LaRocca and John S. Klemanski, *U.S. State Election Reform and Turnout in Presidential Elections*, 11 State Politics and Policy Quarterly 76 (2011) (**Exhibit 8**). LaRocca and Klemanski's work is especially valuable for its summary of the various findings in the literature. It describes the more-or-less consistent findings that early voting has a neutral-to-negative impact on turnout, as parties effectively "cannibalize" their Election Day vote. *Id.* at 79-80 ("Empirical research on the effect of early in-person voting has produced what Gronke calls a 'scholarly consensus' that early in-person voting benefits those who would have voted anyway and has little significant

---

1.      Comparisons of same-day registration laws are likewise difficult. As Plaintiffs' experts note, North Carolina did not utilize the typical same-day registration law. Rather, same-day registration was only allowed during the early voting period. Moreover, relatively few states that employ same-day registration, most of which are overwhelmingly white and less populous than North Carolina, make such comparisons difficult. While Dr. Stewart had a truly inspired idea to correlate Google searches to days of registration, those data do not supply racial information for the searchers. It may well be that African Americans, whom plaintiffs' experts demonstrate are, as a group, differently situated socioeconomically than whites, are responding to different stimuli that would cause them to adjust their registration habits accordingly.

40

effect on overall voter turnout."). They also note the conflicting literature on voter identification laws. *Id.* at 81. They conclude that the Downsian model of voter participation supported by Dr. Burden needs to be re-evaluated in this particular context. *Id.* at 81, 83 ("We therefore theorize that although early in-person voting may be more convenient for some voters, overall this reform will not substantially reduce costs to voters compared to traditional polling-place voting.").

147. Most scholarly literature suggests that parties likely "cannibalize" their Election Day turnout with early voting, while forcing parties and groups to spread their resources over an extended time period. In the words of one study, "reforms merely offer additional convenience for those already likely to vote." Joseph D. Giammo and Brian J. Brox, *Reducing the Costs of Participation: Are States Getting A Return on Early Voting?* 63 Political Research Quarterly 295 (2010). *See also* Barry C. Burden, David T. Cannon, Kenneth R. Mayer and Donald P. Moynihan, *Election Laws, Mobilization and Turnout: The Unanticipated Consequences of Election Reform*, 58 American Journal of Political Science 95 (Jan. 2014) **(Exhibit 9)**; Barry Burden, et al., *The Turnout Effects of Early Voting, Election Day Registration, and Same Day Registration in the 2008 Presidential Election*, paper for "The 2008 U.S. Presidential Election: The Election that Rebranded the United States Abroad" at The Ohio State University Mershon Center for International Security Studies, October 2-3, 2009 ("Most importantly, we find that the most popular proposal – early voting – actually decreases turnout.") **(Exhibit 10)**; Paul Gronke, Eva Galanes-Rosenbaum & Peter A. Miller, "Early Voting and Turnout," 40 P.S, Political Science and Politics 639 (2007) ("Finally, we estimated a comprehensive model of early voting and turnout from 1980-2004. We built upon an extant model of turnout, adding to it a series of variables representing early voting innovations. In this analysis, we did find a positive impact of early voting reforms on turnout, but only in the one state that first initiated VBM in 1995 and

41

fully adopted it after 1998, and in that case, only in presidential years.") (**Exhibit 11**); Paul Gronke, *Early Voting Reforms and American Elections*, Paper presented at the Annual Meeting of the American Political Science Association, Chicago IL, September 2-5, 2004 (**Exhibit 12**).

148.     Michael Crowell, a professor at UNC's School of Government, summarized: "While this review of North Carolina data is not very sophisticated, it is consistent with recent political science research, discussed below, which suggests that early voting may actually decrease voter turnout. The same research shows, on the other hand, that same-day registration and voting can increase turnout somewhat. When done together, early voting and same-day registration neutralize each other. And, as one might expect, factors other than election laws have more to do with how many people vote." Michael Crowell, "Coates' Canons Blog: Do Election Laws Affect Voter Turnout?", at http://canons.sog.unc.edu/?p=7557.

149.     Finally, although the state's voter identification law has not been a focus of the experts' reports, the scholarly literature has struggled to find an impact on turnout, or an impact on racial turnout in particular. *See, e.g.*, Jason Mycoff, Michael W. Wagner, and David C. Wilson, *The Empirical Effects of Voter-ID Laws: Present or Absent?* 42 PS: Political Science & Politics 121 (2009) (**Exhibit 13**). Even skeptics of voter identification laws have had a difficult time discerning effects on turnout, although this may change as more states implement these laws and our data improve. *E.g.*, Robert S. Erikson and Lorraine C. Minnite, *Modeling Problems in the Voter Identification—Voter Turnout Debate*, 8 Election Law Journal 85 (2009) (**Exhibit 14**).

Case 1:13-cv-00658-TDS-JEP     Document 136-5     Filed 06/18/14     Page 43 of 73

## CONCLUSIONS

150. Two conclusions follow from my analysis. First, North Carolina's recent vote reforms do not create an outlier. On the contrary, they take the most permissive election scheme in the country and create one that is closer to the median in American politics.

151. Second, plaintiffs' experts fail to control adequately for national effects in their analysis, and fail to place North Carolina's surge in minority participation during the 2000s in any sort of context. We simply do not have sufficient data to conclude that North Carolina's vote reforms will significantly impact minority groups' voting habits. Indeed, the experience of other states with less permissive regimes suggests otherwise.

152. The point of this report is to place the conclusions of plaintiffs' experts in a wider context – both in terms of the elections that they analyze and the scholarly literature as a whole. The theoretical claims plaintiffs' experts make have merit, but the real-world evidence in support of those theories is, at best, thin. Their conclusions about North Carolina are effectively built around the effects of the Obama campaign, which was unique both inherently and in terms of the resources and strategies that it brought to bear on the state. When the overall data for North Carolina are placed in the context of the conclusions of other scholars' work, it is simply impossible to say with any reasonable degree of certainty that the changes to North Carolina's voting laws will decrease minority participation.

153. As one North Carolina-based professor summarized, "In sum, based on this limited analysis, the changes in North Carolina's registration and voting laws over the last 32 years appear not to have made a significant difference in how many people vote. While it has become noticeably easier to register to vote, and to stay on the rolls, about the same proportion of citizens go to the polls now as before. It seems more likely that voting depends on factors such

43

as the nature of the election, how much seems to be at stake, the level of media coverage, and how much effort candidates and parties put into identifying and mobilizing their voters." Crowell, *supra*.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

This the 25th day of April, 2014.

Sean P. Trende

# EXHIBIT 1

## SEAN P. TRENDE
6680 Hawksnest Ct.
Westerville, OH 43082
strende@realclearpolitics.com

## EDUCATION

B.A., Yale University, with distinction, History and Political Science, 1995.

M.A., Duke University, *cum laude*, Political Science, 2001. Thesis titled *The Making of an Ideological Court: Application of Non-parametric Scaling Techniques to Explain Supreme Court Voting Patterns from 1900-1941*, June 2001.

J.D., Duke University School of Law, *cum laude*, 2001; Duke Law Journal, Research Editor; Moot Court Board.

## PROFESSIONAL EXPERIENCE

Law Clerk, Hon. Deanell R. Tacha, U.S. Court of Appeals for the Tenth Circuit, 2001-02.

Associate, Kirkland & Ellis, LLP, Washington, DC, 2002-05.

Associate, Hunton & Williams, LLP, Richmond, Virginia, 2005-09.

Associate, David, Kamp & Frank, P.C., Newport News, Virginia, 2009-10.

Senior Elections Analyst, RealClearPolitics, 2009-2012.

## BOOKS

Larry J. Sabato, ed., *Barack Obama and the New America*, ch. 12 (2013)

Barone, Kraushaar, McCutcheon & Trende, *The Almanac of American Politics 2014* (2013).

*The Lost Majority: Why the Future of Government is up for Grabs – And Who Will Take It* (2012).

## SELECTED REAL CLEAR POLITICS COLUMNS

Full archives available at http://www.realclearpolitics.com/authors/sean_trende/

"Could Democrats Gain Senate Seats This Fall?" - April 17, 2014

"It's Time to Increase the Size of the House" - March 6, 2014

"Will Demographics Really Destroy GOP?" - February 11, 2014

"2020 Reapportionment and Voting Rights Act" - January 30, 2014

"Why the 2014 Senate Races Matter So Much" - January 23, 2014

"Population Data Show More Movement South and West" - December 30, 2013

"Democrats' 2013 Drop-Off Problem" - December 4, 2013

"How Much Did Demographics Matter in Va. Race?" - November 12, 2013

"Projecting Obamacare's Early Enrollment Numbers" - November 1, 2013

"How Much Does Voter Ignorance Matter?" - October 16, 2013

"How Mich. Rebuts Redistricting/Polarization Claims" - October 15, 2013

"Gerrymandering Isn't to Blame for D.C. Impasse" - October 11, 2013

"What If Party Makeovers Don't Work?" - August 15, 2013

"Are Republicans Really Out of Step?" - August 14, 2013

"Are Elections Decided by Chance?" - August 13, 2013

"Is Mitch McConnell in Trouble?" - August 12, 2013

"Can Tom Cotton Win?" - August 6, 2013

"Democrats' Problem With White Voters" - July 18, 2013

"Yes, the Missing Whites Matter" - July 12, 2013

"Demographics and the GOP, Part IV" - July 2, 2013

"The GOP and Hispanics What the Future Holds" - June 28, 2013

"The Case of the Missing White Voters, Revisited" - June 21, 2013

"Gays and Growing Your Own Why Support Shifted" - June 6, 2013

"What Obama Should Have Done in 2009" - June 12, 2012

"Obama as the Green Lantern" - May 22, 2013

"Sweeping Conclusions From Census Data Are a Mistake" - May 9, 2013

2

"Southern Whites' Shift to the GOP Predates the '60s" - April 30, 2013

"An Immigration "Bonanza" for Democrats?" - April 24, 2013

"Fault Lines Loom for "Dominant" Dem Majority - April 19, 2013

"What 2012 Population Estimates Could Mean in 2020" - December 21, 2012

"The Political Landscape After 2012" - November 16, 2012

"The Case of the Missing White Voters" - November 8, 2012

"2012 A Close Race, With a High Degree of Uncertainty" - November 6, 2012

"Did JFK Lose the Popular Vote?" - October 19, 2012

"Minority Turnout & the Racial Breakdown of Polls" - August 29, 2012

"Why the Weak Economy Doesn't Doom Obama" - August 24, 2012

"CBS/NYT/Quinnipiac Swing State Polls & Party ID" - August 1, 2012

"How Romney Might Rate the VP Contenders" - July 17, 2012

"A Closer Look at Those Wisconsin Exit Polls" - June 7, 2012

"Why Tuesday's Democratic Primaries Matter" - May 24, 2012

"Romney Faces a 'Blue Wall' -- But Is It Solid?" - May 18, 2012

"What Has Made Congress More Polarized?" - May 11, 2012

"Romney's Path Is Not Necessarily Narrow" - May 8, 2012

"Are Poll Sampling Complaints Legit?" - April 20, 2012

"Data Indicate Election Will Be Referendum" - April 18, 2012

"Wisconsin Could Be GOP Turning Point" - April 3, 2012

"The Slog to 1,144 So Far, Demographics Trump Momentum" - March 13, 2012

"Romney Really Might Not Have the Delegates by June" - March 9, 2012

"Why 2012 Is Not the GOP's 'Last Chance'" - March 6, 2012

3

"A Closer Look at the Senate Race in Quirky Maine" - March 2, 2012

"Odds of a Brokered Convention Are Increasing" - February 28, 2012

"A Brokered Convention Could Be Dangerous for GOP" - February 17, 2012

"How Likely Is a Brokered Convention?" - February 15, 2012

"Path to a Brokered GOP Convention Emerges" - February 9, 2012

"A Demographic Divide: Could Evangelicals Block Romney?" - February 6, 2012

"Is January Jobs Report a Turning Point for Obama?" - February 3, 2012

"How Much Does Voter Turnout Matter?" - February 1, 2012

"Gingrich and Romney Are 'Unelectable'? So Is Obama" - January 31, 2012

"The Trouble With Saving Allen West's District" - January 31, 2012

"Three Takeaways From South Carolina" - January 22, 2012

"Supreme Court Tosses Texas Court's Congressional Map" - January 20, 2012

"Two Takeaways From Rick Perry's Ill-Fated Campaign" - January 19, 2012

"Why Romney Can Win in South Carolina" - January 19, 2012

"Why Huntsman Reached the End of the Road" - January 16, 2012

"Why Obama's Florida Numbers Should Worry Him" - January 12, 2012

"Another Perfect Night for Mitt Romney" - January 11, 2012

"The Real Reason Mitt Romney Has the Lead" - January 7, 2012

"Three Lessons From the Iowa Caucus Results" - January 4, 2012

"The Lost Majority" - January 3, 2012

"What 2010 Census Tells Us About 2020 Reapportionment" - December 28, 2011

"In Pennsylvania, the Gerrymander of the Decade?" - December 14, 2011

"A Brokered GOP Convention? Don't Bet on It" - December 13, 2011

4

"Unsustainable Debt, Unsustainable Gridlock" - December 9, 2011

"Obama's 2012 Chances and Democratic Demographic Dreaming" - November 30, 2011

"Race to Replace Frank Could Be Competitive" - November 28, 2011

"Cain, the GOP and the Black Vote" - November 23, 2011

"More on Models: Answering Critics on Election Predicting" - November 22, 2011

"Democrats Have an Uphill Climb to Retake the House" - November 21, 2011

"What's Behind Obama's Uptick in Job Approval -- and Will It Stick?" - November 14, 2011

"The Fuzzy Math, and Logic, of Election Prediction Models" - November 11, 2011

"Odds Favor GOP Gaining Senate Control in 2012" - September 28, 2011

"New York-9 and the Democratic Coalition" - September 14, 2011

"Redistricting Makes Taking Back the House Difficult for Dems" - June 29, 2011

"Redistricting Has Democrats California Dreaming" - June 15, 2011

"Redistricting Wars Begin in Illinois" - June 7, 2011

"Quick Thoughts on NY-26" - May 25, 2011

"Wisconsin District Election May Give Clues to Recalls" - May 11, 2011

"Getting Real About Obama's Chances, Part II" - April 22, 2011

"Getting Real About Obama's Chances, Part I" - April 21, 2011

"What Prosser's Victory Means for the Recall Elections" - April 19, 2011

"Reading the Wisconsin Tea Leaves" - April 7, 2011

"Conservatives--And Gov. McDonnell--Are Wrong About Autism Coverage" - April 4, 2011

"Obama Should Use 'Colorado Strategy' to Win Ohio" - March 18, 2011

"Akaka's Seat a Longshot for GOP" - March 4, 2011

"An Early Look at Obama's Re-election Bid" - February 9, 2011

5

"Rep. Harman to Resign From Congress" - February 7, 2011

"Assessing the 2012 Senate Battlefield" - January 20, 2011

"Brown, Obama Lead Generic Republicans in Ohio" - January 20, 2011

"What Lieberman's Retirement Means for 2012" - January 19, 2011

"What Conrad's Retirement Means for 2012" - January 18, 2011

"Reapportionment and the Electoral College" - December 21, 2010

"Assessing The Obama Coalition, Part II" - November 19, 2010

"Assessing The Obama Coalition" - November 16, 2010

"A Preview of 2012 Redistricting" - November 11, 2010

"Election 2010: An Inconsistent Wave" - November 9, 2010

"An Anti-Democratic Year" - November 4, 2010

"Biggest GOP Gains In Statehouses" - November 3, 2010

"Etheridge in Trouble in the Tar Heel State" - October 28, 2010

"Gauging Momentum in House and Senate Races" - October 28, 2010

"What to Make of Early Voting?" - October 27, 2010

"Who's Going to Vote This Year?" - October 22, 2010

"Is School Almost Out for Dem Classes of '06, '08?" - October 22, 2010

"Democrats Didn't Prepare for a Year Like This" - October 18, 2010

"How to Understand the Incumbent Rule" - October 12, 2010

"Democrats' Troubles: The Bigger Picture" - October 7, 2010

"Are Democrats Shedding Hispanic Voters?" - October 4, 2010

"Four Things to Know About Delaware" - September 16, 2010

"Signs of a Democratic Rebound?" - September 13, 2010

6

"Misunderstanding the Southern Realignment" - September 9, 2010

"Bigger Than 1994" - September 2, 2010

"Poll Points Toward Close Senate, Not GOP Takeover" - August 12, 2010

"Republicans Regain Historic Lead in Gallup Generic Ballot" - August 10, 2010

"Are Things Getting Worse for House Democrats?" - August 3, 2010

"Dems' Edge With Minorities Falls" - July 31, 2010

"Yes, The Democrats Can . . . Lose The House" - July 29, 2010

"Watch What the Parties Do, Not What They Say" - July 23, 2010

"Dems Headed for Potential State House Disaster" - July 19, 2010

"It's Not 'Just the Economy, Stupid' This Time" - July 13, 2010

"The Politics of Arizona's Immigration Law" - July 8, 2010

"Dems' Political Landscape Not Improving" - June 18, 2010

"2010 Anti-Incumbent, Anti-Liberal, or Anti-Democrat?" - May 18, 2010

"Overreading The Tea Leaves In PA-12" - May 15, 2010

"Yes, Obama's Coalition Is Weak" - April 27, 2010

"How Bad Could 2010 Really Get For Democrats?" - April 14, 2010

"Why the Health Care Bill Could Be Repealed" - March 30, 2010

"Is The Senate Also In Play?" - January 25, 2010

"The House Is Very Much In Play" - January 19, 2010

"A Close Brown-Coakley Finish Would Be a Big Deal" - January 13, 2010

"Can Republicans Win Ted Kennedy's Senate Seat" – December 31, 2009

"Party Switchers Have Short Lifespans" – December 22, 2009

"The Health Care Bill Is Political Suicide" - December 19, 2009

"How Unemployment Affects Midterm Elections" - November 25, 2009

"Can the Clinton Coalition Survive Obama?" - November 13, 2009

"A Split Decision In November?" - October 16, 2009

"2010 Could Easily Be Disastrous For Democrats" - October 1, 2009

"Voting For Obamacare Will Not Help Save Democrats' Majorities" - September 2, 2009

"Can Republicans Take Obama's Senate Seat In 2010?" - August 10, 2009

"There Are No Permanent Majorities In America" - July 2, 2009

"Is A 2010 Republican Comeback Really Impossible?" - May 12, 2009

"A Long Term Problem for Republicans" - April 29, 2009

"A Poor Republican Performance In Upstate New York" - April 1, 2009

"Will Democrats Face a 1994 Repeat in 2010?" - March 9, 2009


**JOURNAL AND PERIODICAL ARTICLES FROM LAST 10 YEARS**

"The GOP and the Latino Vote," *National Review*, June 15, 2012.

"Political Economy," *National Review*, Special 2010 Election Issue.

"It's 1974 All Over Again," *The Weekly Standard*, Apr. 26, 2010.

"Defamation, Anti-SLAPP Legislation, and the Blogosphere: New Solutions for an Old Problem," 44 Duq. L. Rev. 607 (2006).

(with Christian C. Burden), "The Economic Loss Rule and Franchise Attorneys," 27 Franchise L.J., 192 (2008)

**SELECTED PRESENTATIONS AND APPEARANCES**

Panelist, "Independent Experts on Republican Candidates" (with Michael Barone and Josh Kraushaar), American University, Washington, DC, November 2011.

Panelist, "2011 Mortimer Caplin Conference on the World Economy" (with Bill Schneider, John Sides, and Sarah Binder), The National Press Club, Washington, DC, December 2011.

"The State of the Presidential Nominating Process: A Debate" (with Jay Cost), Berry College, December 2011.

"The Lost Majorities: 2008, 2010 and America's Political Future," Bradley Lecture, American Enterprise Institute, January 2012.

Panelist, "Collective Bargaining, Public Pensions and Voters: The Policy and Politics of Public-Sector Employees in the 2012 Elections," (with Karlyn Bowman, Ruy Teixeira, and Henry Olson), American Enterprise Institute, January 2012.

"The People's Money: How Voters Will Balance the Budget and Eliminate the Federal Debt.," (with Michael Barone and Scott Rasmussen), CATO Institute, March 2012.

"Obama's Vanished Coalition," (with Lance Tarrance and Emily Ekins), CATO Institute, April 2012.

Panelist, "The Future of Red and Blue," (with Ruy Teixeira), Bipartisan Policy Center, Washington, DC, April 2012.

"The 2012 Elections: Trends, Prognostications and What's at Stake," 3rd Annual Family Office Wealth Management Forum, Greensboro, Georgia, May 2012.
Appeared in countless radio and television appearances including appearances on Fox News, ABC News Australia, Fox News Radio, Beijing Radio, CNN Radio, NPR, and other outlets.

Panelist, "The Power of Pundits," (with John Sides, Linda Vavreck, and Melissa Harris-Perry), American Political Science Ass'n, Aug. 29, 2013.

Case 1:13-cv-00658-TDS-JEP    Document 136-5    Filed 06/18/14    Page 55 of 73

# EXHIBIT 2

**Exhibit 2: Sources**

1. Plaintiffs' Expert Reports and Declarations.

2. United States Congressman Keith Ellison, in Support of Petitioners, *Crawford v. Marion County Election Bd.* (Nov. 12, 2007).

3. Statutes:

    a. Those cited in Exhibits 3 – 7 and in the Trende Declaration.

4. Online datasets:

    a. Current Population Survey, Voting and Registration Supplements, available at https://www.census.gov/hhes/www/socdemo/voting/publications/p20/2012/tables.html. Different years can be accessed by changing the "2012" to the desired election.

    b. Dave Leip, *Atlas of United States Elections*, http://uselectionatlas.org/Results, (last visited April 24, 2014).

    c. http://edition.cnn.com/ELECTION/2004/special/president/campaign.ads/.

    d. http://www.cnn.com/ELECTION/2008/map/ad.spending/.

    e. http://www.washingtonpost.com/wp-srv/special/politics/track-presidential-campaign-ads-2012/.

    f. Secretary of State websites, as referenced in the Trende Declaration.

    g. National Conference of State Legislatures – Voter Identification Requirements. http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.

    h. National Conference of State Legislatures – Same Day Voter Registration. http://www.ncsl.org/research/elections-and-campaigns/same-day-registration.aspx.

i. National Conference of State Legislatures – Pre-Registration for Young Voters. http://www.ncsl.org/research/elections-and-campaigns/preregistration-for-young-voters.aspx.

j. National Conference of State Legislatures – Absentee and Early Voting. http://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

k. John Sherman, *Saving Votes*, Fair Elections Legal Network, Feb. 24, 2014, http://fairelectionsnetwork.com/sites/default/files/Provisional%20Ballot%20Rejec tion%20Memo%20FINAL.pdf.

5. Books:

a. Val Atkinson, *Southern Racial Politics & North Carolina's Black Vote* (2007).

b. Earl Black & Merle Black, *The Rise of the Southern Republicans* (2002).

c. Rob Christensen, *The Paradox of Tar Heel Politics: The Personalities, Elections, and Events that Shaped Modern North Carolina* (2012).

d. Kathleen Hall Jamieson, *Electing the President 2008* (2009).

e. John Judis & Ruy Teixeira, *The Emerging Democratic Majority* (2002).

f. David B. Magleby, ed., *Financing the 2000 Election* (2002).

g. Gerald M. Pomper, ed., *The Election of 2000* (2001).

6. Newspapers/Websites:

a. Philip Bump, *A State-By-State Look at the Record Black Turnout in 2012*, The Wire, (May 9, 2013), http://www.thewire.com/politics/2013/05/black-turnout-2012-state-by-state-maps/65053/.

11

b. Jamison Foser, *CNN Read Minds, Not Polls, Wrote Off Kerry-Edwards Chances in North Carolina*, MediaMatters for America, (July 7, 2004), http://mediamatters.org/research/2004/07/07/cnn-read-minds-not-polls-wrote-off-kerry-edward/131397.

c. Ryan Lizza, *Battle Plans: How Obama Won*, The New Yorker (Nov. 17, 2008), http://www.newyorker.com/reporting/2008/11/17/081117fa_fact_lizza?currentPage=all.

d. Michael P. McDonald, "2012 Turnout: Race, Ethnicity and the Youth Vote, *Huffington Post*, http://www.huffingtonpost.com/michael-p-mcdonald/2012-turnout-race-ethnict_b_3240179.html (last visited Apr. 24, 2014).

e. James Nord, *Most States Have Both Early and No-Excuse Absentee Balloting, but not Minnesota*, MinnPost, June 17, 2013 available at http://www.minnpost.com/effective-democracy/2013/06/most-states-have-both-early-and-no-excuse-absentee-balloting-not-minneso

f. Eli Saslow, *Democrats Registering In Record Numbers*, Wash. Post (Apr. 28, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/04/27/AR2008042702272.html.

g. William M. Welch, *Study: Voter Interest High, Registrations Up*, USA Today (Nov. 2, 2008), http://usatoday30.usatoday.com/news/politics/election2008/2008-11-02-vote_N.htm?csp=34.

7. Journals:

12

a.  Barry C. Burden, David T. Cannon, Kenneth R. Mayer and Donald P. Moynihan, *Election Laws, Mobilization and Turnout: The Unanticipated Consequences of Election Reform*, 58 American Journal of Political Science 95 (Jan. 2014).

b.  Craig Leonard Brians & Bernard Grofman, *Election Day Registration's Effect on U.S. Voter Turnout*, 82 Social Science Quarterly, 170 (2001).

c.  Barry Burden, et al., *The Turnout Effects of Early Voting, Election Day Registration, and Same Day Registration in the 2008 Presidential Election*, paper for "The 2008 U.S. Presidential Election: The Election that Rebranded the United States Abroad" at The Ohio State University Mershon Center for International Security Studies, October 2-3, 2009.

d.  Michael Crowell, "Coates' Canons Blog: Do Election Laws Affect Voter Turnout?", at http://canons.sog.unc.edu/?p=7557.

e.  Robert S. Erikson and Lorraine C. Minnite, *Modeling Problems in the Voter Identification—Voter Turnout Debate*, 8 Election Law Journal 85 (2009).

f.  Joseph D. Giammo and Brian J. Brox, *Reducing the Costs of Participation: Are States Getting A Return on Early Voting?* 63 Political Research Quarterly 295 (2010).

g.  Paul Gronke, Eva Galanes-Rosenbaum & Peter A. Miller, "Early Voting and Turnout," 40 P.S, Political Science and Politics 639 (2007).

h.  Paul Gronke, *Early Voting Reforms and American Elections*, Paper presented at the Annual Meeting of the American Political Science Association, Chicago IL, September 2-5, 2004.

13

i. Stephen Knack & James White, *Election-Day Registration & Turnout Inequality*, 22 Political Behavior, 29 (2000).

j. Roger LaRocca and John S. Klemanski, *U.S. State Election Reform and Turnout in Presidential Elections*, 11 State Politics and Policy Quarterly 76 (2011).

k. Willam Lyons and John M. Scheb, II, *Early Voting and the Timing of the Vote: Unanticipated Consequences of Electoral Reform*, 31 State & Local Gov't Rev., 147 (1999)

l. Seth E. Masket, *Did Obama's Ground Game Matter? The Influence of Local Field Offices During The 2008 Presidential Election*, 73 Public Opinion Quarterly 1026 (2009).

m. Seth C. McKee, et al., *Achieving Validation: Barack Obama and Black Turnout in 2008*, 12 State Politics & Policy Quarterly 16 (2012).

n. Jason Mycoff, Michael W. Wagner, and David C. Wilson, *The Empirical Effects of Voter-ID Laws: Present or Absent?* 42 PS: Political Science & Politics 121 (2009).

o. Robert M. Stein, *Early Voting*, 62 Public Opinion Quarterly 57 (1998).

8. Phone calls to Secretaries of State and Boards of Elections as referenced in declaration.

14

# EXHIBIT 3

Exhibit 3

State Laws re Photographic Identification Requirements

| State | Photo Req'd | Statute(s) |
|---|---|---|
| AL | Yes | Ala. Code §17-9-30 |
| AK | No | Alaska Stat. §15.15.225 |
| AZ | No | Ariz. Rev. Stat. Ann. §16-579(A) |
| AR | Yes | Act 595 of 2013 |
| CA | No | |
| CO | No | Colo. Rev. Stat. Ann. §1-1-104(19.5) |
| CT | No | Conn. Gen. Stat. Ann. §9-261 |
| DC | No | |
| DE | No | 15 Del. Code §4937 |
| FL | Yes | Fla. Stat. Ann. §101.043 |
| GA | Yes | Ga. Stat. Ann. §21-2-417 |
| HI | No | Haw. Code Rev. §11-136 |
| ID | Yes | 34 Idaho Code Ann. §34-1106(2) |
| IL | No | |
| IN | Yes | Ind. Code Ann. §§3-5-2-40.5, 3-10-1-7.2, 3-11-8-25.1 |
| IA | No | |
| KS | Yes | Kan. Stat. Ann. §§25-2908,25-1122,25-3002, 8-1324(g)(2) |
| KY | No | Ky. Rev. Stat. Ann. §117.227 |
| LA | Yes | La. Rev. Stat. Ann. §18:562 |
| ME | No | |
| MD | No | |
| MA | No | |
| MI | Yes | Mich. Comp. Laws §168.523 |
| MN | No | |
| MS | Yes | Miss. Code Ann. § 23-15-563 |
| MO | No | Mo. Ann. Stat. § 115-427 |
| MT | No | Mont. Code Ann. § 13-13-114 |
| NE | No | |
| NV | No | |
| NH | Yes | N.H. Rev. Stat. §659:13 |
| NJ | No | |
| NM | No | |
| NY | No | |
| NC | Yes | HB 589 |
| ND | No | N. Dak. Code §16.1-05-07 |
| OH | No | Ohio Rev. Code Ann. §§3503.16(B)(1)(a), 3505.18(A)(1) |
| OK | No | 26 Okla. Stat. Ann. §7-114 |
| OR | No | |
| PA | Yes | Act 18 |
| RI | Yes | R.I. Admin Code §17-19-24.2 |

Case 1:13-cv-00658-TDS-JEP    Document 136-5    Filed 06/18/14    Page 63 of 73

| | | |
|---|---|---|
| SC | Yes | S.C. Code Ann. §7-13-710 |
| SD | Yes | S.D. Codified Laws §12-18-6.1, 6.2 |
| TN | Yes | Tenn. Code Ann. § 2-7-112 |
| TX | Yes | Tex. Elec. Code Ann. § 63.001 |
| UT | No | Utah Code Ann. §§ 20A-1-102(76), 20A-3-104 |
| VT | No | |
| VA | Yes | Va. Code Ann. §24.2-643(B) |
| WA | No | Wash Admin Code. §29A.40.160(7)(a) |
| WV | No | |
| WI | Yes | Wisc. Stat. Ann. § 5.02(6m), 6.79(2)(a) |
| WY | no | |

15

# EXHIBIT 4

## Exhibit 4: State Laws re Out-of-Precinct Voting

| State | Out-of-Precinct Allowed? | Statute | Notes |
|-------|--------------------------|---------|-------|
| AL | No | Ala. Code §§ 17-9-10, 17-10-2(b)(2) | |
| AK | Yes | Alaska Stat. § 15.20.211(a); Alaska Admin. Code tit. 6, § 25.541 | Fed Only, Statewide, State Senate |
| AZ | No | Ariz. Rev. Stat. Ann. § 16-584 | |
| AR | No | Ark. Code Ann. § 7-5-308(d)(2); 108.00.9 Ark. Code R. § 909 | |
| CT | Yes | Cal. Elec. Code § 14310(c)(3) | Only if correct county |
| CO | Yes | Colorado Election Rule 1-8.5-109 | Fed, Statewide Only, correct County |
| CT | No | Conn. Gen. Stat. Ann § 9-232l-m | Only if correct town |
| DC | Yes | D.C. Code § 1-1001.09 | |
| DE | No | 15 Del. C. § 4948(h)(7) | |
| FL | No | Fla. Stat. Ann. § 101.048(2)(b) | |
| GA | Yes | Ga. Code Ann. § 21-2-419(c)(2) | Only if correct county |
| HI | No | Haw. Code R. § 3-172-140(c); 11-25 | |
| ID | No | | |
| IL | Yes | 10 Ill. Comp. Stat. Ann. §§ 5/18A-15(b), 5/18A-15(e) | Fed and Statewide Only |
| IN | No | Ind. Code Ann. § 3-11.7-5-3 | |
| IA | No | http://www.state.ia.us/government/ag/latest_news/releases/oct_2004/Election%20provisional%20voting%20AG-SOS%20ltr%2010-28-04.pdf | |
| KS | Yes | Kan. Stat. Ann. § 25-3002(b)(3) | Only if correct county |
| KY | No | 31 Ky. Admin. Regs. 6:020 §§ 4(13)-(14) | |
| LA | Yes | La. Rev. Stat. Ann § 18:566 | Federal Only, Correct Parish |
| ME | No | 21A-Me.Rev.Stat.Ann. § 673 | |
| MD | Yes | Md. Code Ann., Elec. Law § 11-303(e) | All offices voter was eligible to vote for, no geographic limitations |
| MA | No | Mass. Gen. Laws Ch. 54, § 76C(d) | Must be in correct town |

16

| | | | |
|---|---|---|---|
| MI | No | Mich. Comp. Laws § 168.523a | |
| MN | No | Minn. Stat. 201.016 (1) | |
| MS | No | Miss. Code Ann. § 23-15-573 | |
| MO | No | Mo. Ann. Stat. § 115.425 | Correct Polling Place Only |
| MT | No | http://sos.mt.gov/elections/Officials/documents/MTVotes-Late-Registration-Provisional.pdf | |
| NE | No | Neb. Rev. Stat. Ann. § 32-1002(5)(e) | |
| NV | No | Nev. Rev. Stat. Ann. § 293.3085(4) | |
| NH | No | N.H. Rev. Stat. § 659:27-a | |
| NJ | Yes | N.J. Stat. Ann. § 19:53C-17 | Only if correct county |
| NM | Yes | N.M. Stat. Ann. § 1-12-25.4(F) | Only if correct county |
| NY | No | N.Y. Elec. Code § 8-502 | Correct Polling Place |
| NC | No | N.C. Gen. Stat. Ann. § 163-182.2(a)(4) | |
| ND | No | N.D. Cent. Code § 16.1-05-06 | |
| OH | No | State ex rel. Painter v. Brunner, 941 N.E.2d 782 (Ohio 2011) | |
| OK | No | 26 Okla. Stat. Ann. § 7-116.1(C) | |
| OR | Yes | Or. Rev. Stat. Ann. § 254.408(6) | All offices voter was eligible to vote for |
| PA | Yes | 25 Pa. Cons. Stat. § 3050(a.4)(7) | Only if correct county |
| RI | Yes | R.I. Admin. Code § 23-1-10:6(B)(1) | Federal Only |
| SC | No | S.C. Code Ann. §§ 7-13-820, 7-13-830 | |
| SD | No | S.D. Codified Laws § 12-20-5.1 | |
| TN | No | Tenn. Code Ann. § 2-7-112(a)(3)(B) | |
| TX | No | Tex. Elec. Code Ann. § 63.011(a); 1 Tex. Admin. Code §§ 81.172(c)(1), 81.172(i)(4)(J) | |
| UT | Yes | Utah Code Ann. § 20A-4-107 (2013) | Only if correct county |
| VT | No | Vt. Stat. Ann. tit. 17, § 2555 | |
| VA | No | Va. Code Ann. § 24.2-653(B) | |
| WA | Yes | Wash. Admin. Code 434-262-031, 434-262-032(4), 434-262-032(5) | All offices voter was eligible to vote for |
| WV | No | W. Va. Code § 3-1-41(d) | Only Election Commissioners/Clerks |
| WI | No | Wis. Stat. §§ 6.92, 6.94 | |
| WY | Yes | Wyo. Stat. Ann. § 22-15-106 | Same County |

17

# EXHIBIT 5

Exhibit 5: In-Person Early Voting Laws

| State | Early Voting | Statute | Notes |
|-------|------|---------|-------|
| AL | No | | |
| AK | Yes | Alaska Stat. Ann. § 15.20.064 | 15 days |
| AZ | Yes | Ariz. Rev. Stat. Ann. § 16-541 | 23 days |
| AR | Yes | Ark. Code Ann. § 7-5-418 | 15 days |
| CA | Yes | Determined by Local Office | 30 days |
| CO | Yes | Colo. Rev. Stat. Ann. § 1-8-202 | 15 days |
| CT | No | | |
| DC | Yes | D.C. Code § 1-1001.09(b-1)b | 13 |
| DE | No | | |
| FL | Yes | Fla. Stat. Ann. § 101.657 | 8 |
| GA | No | Ga. Code Ann. § 21-2-380; 21-2-385(d), Act 343, H.B. 310 | 19 |
| HI | Yes | Haw. Rev. Stat. §§ 15-7 | 12 |
| ID | No | Idaho Code Ann. §§ 34-1006, 34-408A, 34-1012 Call to Secretary of State | ~18 |
| IL | No | 10 ILCS 5/19A-10, 5/19A-15 | 13 |
| IN | No | Ind. Code § 3-11-10-26 | 28 |
| IA | No | Iowa Code §§ 48A.9, 53.10, 53.11 | 40 |
| KS | No | Kan. Stat. Ann § 25-1122; call to Secretary of State | 14 |
| KY | No | | |
| LA | No | La. Rev. Stat. Ann. § 18:303(a) | 8 |
| ME | No | 21-A Me. Rev. Stat. § 751 | 38 |
| MD | Yes | Md. Code, Election Law, § 301.1 | 6 |
| MA | No | | |
| MI | No | | |
| MN | No | Minn. Stat. § 203B.02 | 46 |
| MS | No | | |
| MO | No | | |
| MT | No | | |
| NE | No | Neb. Rev. Stat. § 32-942 | 30 |
| NV | No | Nev. Rev. Stat. Ann. § 293.3568 | 14 |
| NH | No | | |
| NJ | No | | |
| NM | No | N.M. Stat. Ann. § 1-6-5.7 | 15 |
| NY | No | | |
| NC | No | N.C. Gen. Stat. § 163-227.2 | 10 |
| ND | Yes | | |
| OH | No | Ohio Rev. Code Ann. § 3509.01 | 29 |
| OK | No | 26 Okla. Stat. Ann. § 14-115/4 | 4 |
| OR | No | N/A | |
| PA | No | | |

18

| | | | |
|------|-----|---------------------------------------|----|
| RI | Yes | | |
| SC | No | | |
| SD | No | S.D. Codified Laws § 12-19-1 | 47 |
| TN | No | Tenn. Code Ann. § 2-6-102 | 16 |
| TX | No | Tex. Elec. Code Ann. §§ 82.005, 85.001 | 12 |
| UT | No | Utah Code Ann. §§ 20A-3-601 | 11 |
| VT | No | 17 Vt. Stat. Ann. §§ 2537, 2531, 2548 | 45 |
| VA | No | | |
| WA | No | N/A | |
| WV | No | W.Va. Code Ann. § 3-3-3 | 10 |
| WI | No | Wisc. Stat. Ann. § 6.85 | 12 |
| WY | No | Wyo. Stat. Ann. § 22-9-102 | 40 |

19

# EXHIBIT 6

Exhibit 6: Same Day Registration

| State | Deadline | Statute | Notes |
|-------|----------|---------|-------|
| AL | 10 | Ala. Code § 17-3-50 | |
| AK | 30 | Alaska Stat. Ann. § 15.07.070 | |
| AZ | 29 | Ariz. Rev. Stat. § 16-120 | |
| AR | 30 | Ark. Code Ann. § 7-5-201 | |
| CA | 0 | Cal. Elec. Code § 2170 | No effect until 2016 |
| CO | 0 | Colo. Rev. Stat. Ann. § 1-2-217.7 | In Person Only |
| CT | 0 | | |
| DC | 0 | D.C. Code § 1-1001.07 | |
| DE | 24 | 15 Del. Code Ann. § 2036 | |
| FL | 29 | Fla. Stat. Ann. § 97-055 | |
| GA | 28 | Ga. Code Ann. § 21-2-224 | |
| HI | 30 | Haw. Rev. Stat. § 11-24 | |
| ID | 0 | 34 Idaho Code Ann. §§ 34-408, 34-308A, 34-410 | |
| IL | 3 | 10 ILCS 5/4-50 | Diff for large, small counties |
| IN | 29 | Ind. Code §§ 3-7-13-11; 3-7-33-3; 3-7-33-4 | |
| IA | 0 | Iowa Code § 48A.9, 48A.7A | |
| KS | 21 | Kan. Stat. Ann § 25-2311 | |
| KY | 28 | Ky. Rev. Stat. Ann. § 116.045 | |
| LA | 30 | La. Rev. Stat. Ann. § 18:135 | |
| ME | 0 | Me. Rev. Stat. tit. 21-A § 121-A | In-person |
| MD | 21 | Md. Code, Election Law, § 3-302 | |
| MA | 20 | Mass. Gen. Laws Ann. ch. 51, § 26 | |
| MI | 30 | Mich. Comp. Laws Ann. § 168.497 | |
| MN | 0 | Minn. Stat. § 201.061 | |
| MS | 30 | Miss. Code Ann. § 23-15-37 | |
| MO | 26 | Mo. Stat. Ann. § 115,135 | |
| MT | 0 | Mont. Code Ann. §13-2-301 | |
| NE | 10 | Neb. Revv. Stat. §§ 32-311.01, 32-302 | |
| NV | 20 | Nev. Rev. Stat. Ann. § 293.560 | |
| NH | 0 | N.H. Rev. Stat. § 654:2 | |
| NJ | 21 | N.J. Stat. Ann. §§ 19:31-6, 31-7 | |
| NM | 28 | N.M. Stat. Ann. § 1-4-8 | |
| NY | 25 | N.Y. Elec. Law §§ 5-210(3), 5-211, 5-212 | |
| NC | 25 | N.C. Gen. Stat. § 163-82.6 | |
| ND | 0 | No Registration | |
| OH | 29 | Ohio Re. Code Ann. § 3503.19 | |
| OK | 24 | 26 Okla. Stat. Ann. § 4-110.1 | |
| OR | 21 | Or. Rev. Stat. Ann. § 247.012 | |

Case 1:13-cv-00658-TDS-JEP    Document 136-5    Filed 06/18/14    Page 72 of 73

| | | | |
|---|---|---|---|
| PA | 30 | 25 Pa. Stat. Ann. § 1326 | |
| RI | 30 | R.I. Gen. Laws § 17-9.1-3 | |
| SC | 30 | S.C. Code Ann. §§ 7-5-130, 7-5-150 | |
| SD | 15 | S.D. Codified Laws § 12-4-5 | |
| TN | 30 | Tenn. Code Ann. § 2-2-109 | |
| TX | 30 | Tex. Elec. Code Ann. § 13.143 | |
| UT | 14 | Utah Code Ann. §§ 20A-2-102.5 | Online |
| VT | 6 | 17 Vt. Stat. Ann. § 2144 | |
| VA | 21 | Va. Code Ann. § 24.2-416 | |
| WA | 8 | Was. Re, Code Ann. § 29A.08.140 | In person |
| WV | 21 | W.Va. Code Ann. § 3-2-6 | |
| WI | 0 | Wisc. Stat. Ann. § 6.55 | |
| WY | 0 | Wyo. Stat. Ann. § 22-3-102 | |